RENDERED: FEBRUARY 20, 2020
TO BE PUBLISHED

# Supreme Court of Kentucky

## 2018-SC-000322-MR

MICHAEL TORRENCE                                      APPELLANT

ON APPEAL FROM JEFFERSON CIRCUIT COURT

V.            HONORABLE AUDRA JEAN ECKERLE, JUDGE

NOS. 16-CR-001550 AND 18-CR-000152

COMMONWEALTH OF KENTUCKY                    APPELLEE

**OPINION OF THE COURT BY JUSTICE WRIGHT**

**<u>AFFIRMING</u>**

In a tri-furcated proceeding, a Jefferson Circuit Court jury convicted Appellant Michael D. Torrence of first-degree assault and possession of a handgun by a convicted felon. The jury further found he was a persistent felony offender. The jury recommended a fifteen-year sentence for the first-degree assault enhanced to twenty-five years by the PFO, and a five-year sentence for possession of a handgun by a convicted felon enhanced to fifteen years by the PFO, with both sentences to be served concurrently for a total sentence of 25 years. Torrence was sentenced in accordance with the jury's recommendation, and now appeals to this Court as a matter of right. Ky. Const. §110(2)(b).

Torrence raises the following claims of error in his appeal, alleging the trial court erred by: (1) failing to remove a juror and failing to grant a mistrial

concerning said juror, (2) allowing a lay witness to testify as to historical cell tower data and several other related sub-issues,[1] and (3) failing to suppress the victim's identification of Torrence in a police photo array and in court. For the following reasons, we affirm Torrence's convictions and corresponding sentences.

## I. BACKGROUND

Michael Torrence's charges stem from events surrounding the shooting of Gerrado Thomas on the afternoon of May 17, 2016, on 26th Street in Louisville. The shooting left Thomas paralyzed below the waist. At trial, in addition to the offenses that resulted in convictions, Torrence was acquitted of first-degree wanton endangerment for shooting into a nearby house.

During police questioning, Torrence claimed he was picking up his daughter in the Blue Lick area of Louisville at the time of the shooting because the child's mother, a former girlfriend, was in the hospital having a baby. The Blue Lick area of Louisville is approximately eleven air miles from the 26th Street shooting location.

The first issue raised in this appeal arose late in the trial. At the start of the penalty phase, Torrence raised concerns that a juror had not been truthful in voir dire when the panel was asked if anyone knew him. Torrence asserted

---

[1] In his brief, Torrence raises four related issues regarding the trial court's rulings as to cell tower evidence. While we acknowledge and analyze all of Torrence's arguments, we treat these related issues as one.

2

Tatiana Turner, the mother of his child and an alibi witness for the defense, recognized the juror when she testified late in the defense case.

The timing concern is centered around when the issue was brought to the trial court's attention. Over a weekend break after guilty verdicts were returned on Friday, and before the penalty phase began on Monday, Torrence's attorney was notified about the juror issue. He brought the matter to the court's attention on Monday morning. While continuing with the penalty phase, the trial court used breaks in the proceedings to take testimony and question Turner and the juror. The trial court ruled it would not excuse the juror or grant a mistrial, and several months later overruled a motion for judgment notwithstanding the verdict (JNOV) and a new trial based on the juror issues.

The next issue raised in this appeal deals with admitting historical cell tower data into evidence. It began when Louisville Metro Police Detective Stephen Snider obtained Torrence's cell phone number and cell phone service provider from the police interview. The detective was seeking to verify Torrence's alibi.

The detective sent AT&T a search warrant requesting historical cell phone tower data for Torrence's cell phone number for the day of the shooting. AT&T sent Detective Snider a 500-page report and after it was explained to him, Detective Snider figured out which cell phone towers Torrence's cell phone was communicating with around the time of the shooting. Cell phone towers have unique identification numbers and their locations were designated in the

report with latitude and longitude coordinates. Also included in the report was a directional degree reading, indicating the direction but not location, of the cell phone in relation to the tower.

Based on the tower coordinates and directional compass readings from the report, Detective Snider produced a graph overlay on a Google™ map of Louisville. The map showed Torrence's cell phone was in contact with towers close to the shooting location and not in contact with towers near the Blue Lick area when Thomas was shot.

On the first morning of trial, Torrence moved for the Commonwealth to disclose experts and expert opinions regarding historical cell tower data. In response, the Commonwealth argued Detective Snider did not need to be qualified as an expert to testify using the historical cell tower report. The Commonwealth asserted that Detective Snider would simply enter the cell tower locations from the historical data report into a Google™ map computer program. Further, the Commonwealth asserted reading the AT&T report was like reading a familiar phone bill and anyone could use Google™ Maps. The Commonwealth assured the trial court the phone company cell tower records were verified. Finding the issues moot because no expert was going to testify, the trial court overruled the motions to disclose experts and expert opinions.

The Commonwealth did not ask Detective Snider any questions about his qualifications, background, experience, or specialized training with historical cell tower evidence. No witness testified (either law enforcement or from a phone company) who had specialized knowledge, experience, or background

4

with historical cell tower data and how it works. Detective Snider testified as to basic information about cell phones connecting to towers and how the information in the report is read.

Detective Snider gave no opinions based on the AT&T report about Torrence's location at the time of the shooting. A map showing two cell tower locations communicating with Torrence's cell phone near the time of the shooting was presented to the jury and entered into evidence. In closing argument, the Commonwealth asserted the graphed map undercut Torrence's alibi.

The final issue raised in this appeal revolves around Thomas's (the victim's) identification of Torrence from a police photo array. Detective Snider testified about police efforts to determine the identity of the shooter initially identified by Thomas as "Man-Man." Detectives presented Thomas with an array containing six photos. Thomas identified Torrence from the photo array as Man-Man, the person who shot him. However, before he made that police photo array identification, Thomas's sister and/or girlfriend showed him a single photo of Torrence they downloaded from a social media site. Torrence moved for the exclusion of Thomas's identification from the police photo array and in court, arguing the identifications were tainted by his sister and girlfriend previously showing him the single photograph. The trial court denied Torrence's motion. In ruling on the motion, the trial court found that Thomas's sister and girlfriend were not acting on behalf of the police—and, therefore,

there was no state action involved in them showing Thomas the single photograph.

Further background information will be developed as needed.

## II. ANALYSIS

### A. Juror Issue

Torrence seeks reversal of his convictions, claiming the trial court erred when it failed to remove a juror and declare a mistrial. Torrence claims further error when the trial court denied his motion for a new trial or JNOV based on the same juror issues. According to Torrence, a juror wrongfully remained silent when asked during general voir dire if anyone knew Torrence or any of the witnesses. Torrence claims the juror met him several years before trial, albeit indirectly, through Turner, his girlfriend at the time of the meeting and an alibi witness at trial.

During voir dire, the juror identified as Juror #2071060 did not respond when asked if anyone knew Torrence. Turner, as a defense witness, was kept out of the courtroom by the trial court's separation order. Near the end of the defense case, Turner testified. The jury returned guilty verdicts on Friday afternoon, and Turner told Torrence's mother over the weekend that she believed she recognized the juror in question. On Monday, the fifth and final day of trial, defense counsel advised the trial court that Juror #2071060 knew Turner and Torrence and had not been honest about that knowledge in her responses during voir dire. In dealing with the very serious issues raised, the trial court took proof including questioning Turner and the juror.

6

The trial court questioned Juror #2071060 multiple times. Each time she was asked, the juror denied knowing Torrence. In response to a repeated question by the trial court about knowing Torrence, the juror responded this was the first time "ever seeing this man." Juror #2071060 told the trial court that she knew "of" Turner but did not know her and had not seen her in more than five years. When the trial court asked the juror what she meant by knowing "of" Turner, she responded that they did not communicate and had never seen one another on a daily basis. The juror also responded that she did not know Turner and Torrence knew each other.

When asked if she and Turner shared a half-sister, the juror responded that her half-sister, Waynesia, and Turner were not "real sisters." We note that even if they had shared a half-sister (as Turner claimed in her testimony), there was never any claim that Turner and the juror were related. In Turner's testimony, she revealed that her father has at least thirty-six children and indicated she had no idea how many households that involved. Defense counsel introduced birth certificates, but they were of no help in resolving the already-tenuous loose familial relationship, as the birth certificates contained empty fields where the child's father would be indicated. Finally, the juror responded to the trial court's inquiry about possible bias, saying, she was "all the way fair."

In her testimony regarding the juror, Turner did not know Juror #2071060's "government name," address, or contact information, but did know that her mother was deceased. Turner testified Torrence and Juror #20171060

7

met several times at Waynesia's house several years prior to trial. According to Turner, she would visit Waynesia on an almost daily basis since the two half-sisters lived just a couple of streets apart from each other, and Juror #20171060 would be there, too. Turner claimed Torrence would stop by regularly and see her, as she was pregnant with his child. Turner acknowledged there were no recent contacts between she and the juror.

The trial court expressed concern that the information about the relationship between Turner and Juror #2071060 came to the court's attention late in the trial. Turner's credibility was suspect for the trial court because Turner had been in and out of the courtroom on the preceding Friday but brought up the issue with Juror #2071060 only after a finding of guilt.

The defense first raised problems with Turner and Juror #2071060 on the fifth and final day of trial—after the jury had reached a verdict in the guilt phase and the alternate juror had been released. During voir dire when issues could have been raised, Turner was not identified by either party as a potential witness and no questions were asked about her. Turner, despite the Commonwealth knowing Torrence claimed her as an alibi witness in his police interview, was not included in the list of names read to the jury by the Commonwealth which included several persons that would not be called as witnesses but might be mentioned during the trial. Knowing Turner was going to be called as an alibi witness, the defense failed to ask the jurors if anyone knew Turner. In fact, they did not even mention Turner's name. Therefore, the juror in question did not fail to disclose knowledge of Turner in voir dire—she

8

was never asked those questions. The record reveals the first time the jury heard Turner's name was during the defense's opening statement. The trial court's concern over the timing of the issue is supported by the record.

The trial court denied the motion to excuse Juror #2071060 and overruled the motion for a mistrial. Months after trial, at a sentencing hearing with Torrence's new counsel, the trial court denied a motion, based solely on the juror issues, for a new trial or JNOV. The trial court referenced the questions and answers from the trial hearings in denying the motion.

### 1. Structural Error

The Sixth Amendment to the United States Constitution, and Sections Seven and Eleven of the Kentucky Constitution guarantee the right to an impartial jury. Structural error occurs when that right is denied. *Hayes v. Commonwealth*, 175 S.W.3d 574, 586 (Ky. 2005). Such a denial would not be subject to harmless error analysis because that would not be appropriate where a substantial right such as this is involved. *Shane v. Commonwealth*, 243 S.W.3d 336, 341 (Ky. 2007). "[T]he defining feature of a structural error is that it 'affect[s] the framework within which the trial proceeds,' rather than being 'simply an error in the trial process itself.' *Commonwealth v. Douglas*, 553 S.W.3d 795, 799–800 (Ky. 2018). Failing to remove a biased juror taints the entire trial. *Id.* at 800.

Mindful of the above principles, we review the trial court's decisions under an abuse of discretion standard, "whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles."

9

*Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999). After careful review, we find the trial court did not abuse its discretion and therefore find no structural error.

## 2. Bias

RCr 9.36(1) states, in pertinent part: "When there is reasonable ground to believe that a prospective juror cannot render a fair and impartial verdict on the evidence, that juror shall be excused as not qualified." In *Ward v. Commonwealth*, 695 S.W.2d 404, 407 (Ky. 1985), this Court quoted a sister state in saying "irrespective of the answers given on voir dire, the court should presume the likelihood of prejudice on the part of the prospective juror because the potential juror has such a close relationship, be it familial, financial or situational, with any of the parties, counsel, victims or witnesses." *Id.* (quoting *Commonwealth v. Stamm*, 286 Pa.Super. 409, 429 A.2d 4, 7 (1981)).

With that in mind, our initial inquiry is whether the juror in question had a "close relationship" with either Torrence or Turner such that prejudice should be presumed. To answer this question, Torrence asserts Juror #2071060 and Turner had a half-sister in common. However, even if they did share a half-sister (as is asserted by Turner and disputed by the juror), both Juror #2071060 and Turner made clear to the trial court that they were not related to each other. The existence of a familial relationship, based on testimony from both Turner and Juror #2071060, proved non-existent. Torrence presented no proof contesting the lack of a familial relationship;

10

instead, Torrence raised situational claims based on the half-sister-in-common relationship.

Relying on Turner's testimony about daily time spent at Waynesia's home, Torrence argues the juror had to have met him and was therefore not truthful with the court. Although conceding no contact between Turner and Juror #2071060 occurred more recently than five or six years prior to trial, Torrence claims the prior contact was critical. Because Torrence asserted he and Turner were dating while she was pregnant with his child, the import of Turner being daily at Waynesia's house is that, if Juror #2071060 saw Turner at Waynesia's, she had multiple opportunities to meet Torrence. Turner claimed Juror #2071060 did meet Torrence at Waynesia's on multiple occasions. No other witnesses supported that claim and Juror #2071060 denied ever seeing him.

Juror #2071060 claimed she did not know Turner, she only knew "of" her, and the two did not communicate with each other. No proof was offered of shared birthday parties, holidays, or other family events related to the contested half-sister. It was not arbitrary for the trial judge to weigh the evidence and give more credibility to the juror than to one of Torrence's alibi witnesses, who was also the mother of his child. Torrence claims the shared relationship between juror #2071060, Turner, and Waynesia produced unavoidable contact between the juror and himself. The trial court found otherwise.

This Court notes that Waynesia was not called as a witness. Both juror #2071060 and Turner claimed her as a half-sister (though the juror disputes that Waynesia and Turner were "real sisters"). It seems as if Waynesia would have been important to corroborate or deny that Turner and the juror had spent substantial time together. However, she was not called to testify. During trial this is more understandable given the time constraints of when this issue arose, but we note she was not called as a witness for the hearing on the motion for a new trial or JNOV motion at a sentencing hearing conducted several months after trial. We do not speculate as to what she might have said if called as a witness.

Reviewing the totality of circumstances in the record, it was not unreasonable for the court to determine the juror possessed the mental attitude of "appropriate indifference" required to sit on a jury. *Gabbard v. Commonwealth*, 297 S.W.3d 844, 854 (Ky. 2009). If this was a close call or the issues could not be resolved with certainty, the juror should have been excused. *Futrell v. Commonwealth*, 471 S.W.3d 258, 273 (Ky. 2015). The record supports that this was not a close call. The juror adamantly told the trial judge she did not know Torrence and was not biased. She even denied Turner's claim that the two of them shared a half-sister. The trial court had full opportunity to view her responses to questions and make a determination as to her credibility. The trial court likewise had the same opportunity to view Turner's responses and assess her credibility. "[D]eference must be paid to the trial judge, who sees and hears the juror, in reviewing determinations of

12

impropriety of challenges for cause." *Penman v. Commonwealth*, 194 S.W.3d 237, 252 (Ky. 2006), *overruled on other grounds by Rose v. Commonwealth*, 322 S.W.3d 76 (Ky. 2010).

Torrence further objects to the use of the transcript of jail calls attached in an appendix to the Commonwealth's brief. The transcript is a purported summary of what was said during Torrence's recorded jail house phone calls. In that transcript, Torrence apparently said he did not recognize the juror but indicated he would say he did. Torrence unsuccessfully moved this Court to strike Appellee's brief for citing to the transcript. The transcript was offered by the Commonwealth and placed in the court file as part of an avowal at the sentencing hearing prior to the trial court ruling on the motion for a new trial or JNOV. The trial court did not have this purported transcript during trial when ruling on the motion to excuse the juror and the motion for mistrial. When the document was presented to the trial court as part of an avowal, it was entered into the record. There is no indication the trial court read or considered it when making the decision to overrule the motion for a new trial or JNOV. The trial court was clear that the decision to overrule the motion was based on the questions and answers from the hearings held during trial.

### 3. *Mendacity and New Trial or JNOV motion*

Torrence also seeks a new trial based on juror mendacity. "To obtain a new trial because of juror mendacity, 'a party must first demonstrate that a juror failed to answer honestly a material question on *voir dire*, and then further show that a correct response would have provided a valid basis for a

13

challenge for cause.'" *Adkins v. Commonwealth,* 96 S.W.3d 779, 796 (Ky. 2003) (quoting *McDonough Power Equip., Inc. v. Greenwood,* 464 U.S. 548, 556 (1984)). Torrence made no such showing here. The material question, "did the juror know Torrence?" was asked during voir dire and answered by her silence. When Juror #2071060 was asked the same question late in the trial, her adamant spoken reply was she did not know Torrence.

Furthermore, any purported relationship between the juror and Turner (one of Torrence's alibi witnesses) was not close, as discussed at length above. As to the juror's mendacity regarding Turner, the juror was never asked during voir dire if she knew or had a connection with Turner. Therefore, she could not have lied about such a connection at that point. It is noteworthy that the defense did not question jurors as to any knowledge of or connection with Turner in spite of her being one of Torrence's alibi witnesses. In fact, the juror was never questioned about knowing Turner until after the jury had reached a guilty verdict—a time after the alternate juror had been excused.

The trial court accepted the juror's answers as truthful. As such:

> On appeal, the factual findings of the trial court "shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." CR 52.01. A factual finding is not clearly erroneous if it is supported by substantial evidence. *Moore v. Asente,* 110 S.W.3d 336, 354 (Ky. 2003). Substantial evidence is "[e]vidence that a reasonable mind would accept as adequate to support a conclusion and evidence that, when taken alone or in the light of all the evidence ... has sufficient probative value to induce conviction in the minds of reasonable men." *Id.* at 354.

*Gullett v. Commonwealth,* 514 S.W.3d 518, 523 (Ky. 2017).

14

### 4. *Mistrial*

Torrence also claims the trial court erred in failing to grant a mistrial. "A trial court is authorized to use its discretion to declare a mistrial only when there is a manifest necessity, when the right to a fair trial has been infringed upon and the prejudicial event cannot otherwise be remedied." *Gray v. Commonwealth*, 534 S.W.3d 211, 215 (Ky. 2017) (internal citations omitted). Having determined the trial court committed no error in failing to excuse the juror, it follows that we find no manifest necessity existed for a mistrial.

After careful review of the record relating to Torrence's claims that the trial court erred by failing to excuse a juror, grant a mistrial, or grant a motion for a new trial or JNOV, we find no error.

## B. Historical Cell Tower Data Testimony

Torrence raises four claims of error by the trial court in admitting historical cell tower evidence obtained through an AT&T report and allowing Detective Snider to testify utilizing that report. In summary, all four claims involve the AT&T report, Detective Snider testifying as a lay witness about information in the report, and whether the Commonwealth should have called an expert witness to testify about historical cell tower data in the report. As we find these issues significantly interconnected, we will review them as one concern. Additional background information is necessary for analysis of this issue.

As noted above, prior to trial, Torrence filed a motion for disclosure of expert testimony and a separate motion to exclude any testimony regarding

historical cell tower evidence pursuant to RCr 7.24. Torrence did not file a motion requesting a hearing pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), challenging historical cell tower evidence. As previously noted, cell phone records from AT&T for Torrence's phone number with historical tower data, including latitude and longitude of specific cell towers, were provided in discovery by the Commonwealth. The Commonwealth's response to the motions was:

> Judge, these are AT&T records and they show what time each phone call was made. It is the typical AT&T records that we normally see where the phone calls are listed in a row in order of date and time, and at the end of each row it shows the latitude and longitude, and the angle from the cell tower, the location of the call being made. So, while yes there were a lot of incomprehensible phone records that were turned over as part of the package, there are also pages that are very familiar to us. That look like phone records or any records we would get in our own phone bills.

The Commonwealth indicated it did not have an expert, would not be qualifying anyone as an expert, and would ask Detective Snider questions about the cell tower data based solely on the AT&T records that anyone could read, interpret, and apply. The Commonwealth assured the trial court the records were verified.

In response, Torrence raised concerns with Detective Snider testifying as a lay witness. Defense counsel stated:

> And Judge, my understanding is that Detective Snider is effectively . . . that I want to contest that these calls, these records are accurate or that these longitude pings are inaccurate, effectively there is nothing that Detective Snider can actually answer as far as just this is what is in the report.

16

The court replied, "Then you can call your own witness to do that, would be the way to challenge it." The trial court overruled the motion to disclose expert testimony as moot and denied the motion to exclude the testimony pursuant to RCr 7.24. Torrence did not call any expert witnesses.

Detective Snider testified about the historical cell tower phone records and the search warrant used to obtain the AT&T report. Detective Snider indicated that he obtained the records in the course of his investigation in an effort to confirm Torrence's alibi that he was in the Blue Lick area picking up his daughter when Thomas was shot.

Detective Snider testified AT&T maintains information for every AT&T cell phone customer. Much of the information in the report is like familiar phone bills the average cell phone customer receives with pages separated into columns by phone number, call or text, date, and time.

Detective Snider pointed out each call line in the report contained additional information not usually found on a customer cell phone bills which was included in the report because of the search warrant request. The request specified unique tower identification numbers for each cell tower Torrence's phone interacted with for calls or texts, the latitude and longitude location of those specific towers, and a directional degree reading based on a 360-degree circle or compass. This reading indicated the direction of the call or text relative to the tower but did not provide an actual location of the phone when a call or text was made. The report is for historical data only: it shows only what happened (which tower a cell phone interacted with at what time), which

17

is different from real-time pinging location technology police use to track a current location for a cell phone.

Detective Snider used a computer to open Google™ Maps on a video display for the jury. On the Google™ map of the relevant parts of Louisville, Detective Snider entered the location of the shooting on 26th Street, the Blue Lick area where Torrence claimed he was at the time of the shooting, and the location of two cell towers to which Torrence's phone connected around the time of the shooting based on the AT&T report. One of the towers showed cell phone interaction for a call at 4:27 p.m. (immediately prior to the shooting) and a second tower showed cell phone interaction for a call at 4:33 p.m. (a few minutes after the shooting). The distance of the two towers from the shooting location according to Google™ Maps was 1.131 miles for the first tower and 3,292 feet for the second tower.

Using the directional compass information from the report, Detective Snider drew a "pie wedge" for each call that showed the direction from the cell tower the phone was when it interacted with the tower. According to Google™ Maps, the Blue Lick area where Torrence claimed to be at the time of the shooting was eleven miles from the 26th Street location of the shooting. No towers in the Blue Lick area showed interaction with Torrence's cell phone around the time of the shooting. Detective Snider did not give an opinion about Torrence's location based on the report or the map he created during the course of his investigation from the report data. The map was entered into

18

evidence. The phone records he utilized in creating the map during his investigation were not entered into evidence.

On appeal, "[w]e will not disturb a trial court's decision to admit evidence absent an abuse of discretion." *Matthews v. Commonwealth,* 163 S.W.3d 11, 19 (Ky. 2005) *citing Partin v. Commonwealth,* 918 S.W.2d 219, 222 (Ky. 1996). "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Goodyear Tire and Rubber Co. v. Thompson,* 11 S.W.3d 575, 581 (Ky. 2000) (citing *English,* 993 S.W.2d at 945).

Both parties refer this court to *Holbrook v. Commonwealth,* 525 S.W.3d 73 (2017). In that case, we reviewed historical cell tower data analysis and found the trial court did not abuse its discretion by permitting the introduction of expert testimony by an FBI special agent regarding historical data analysis of cell phone and cell tower records. The FBI Special Agent had specialized training and experience in cell tower data analysis regarding the data, the technology, the limits of that technology and what the data revealed. It is important to this analysis that the agent did not offer an opinion as to the location of the caller in *Holbrook,* but only as to towers that the phones interacted with when calls were made.

This court revisited cell tower historical data and expert testimony in 2019 in an unpublished opinion, *Rivera-Rodrigues v. Commonwealth,* 2018-SC-000197-MR, 2019 WL 2462783, (Ky. 2019). We affirmed the use of expert testimony by a radio frequency engineer from Sprint (the phone company in

19

that case). As to the location of the callers, again no opinion was offered. We stated:

> As the Commonwealth contends, had Neeman opined that the sectors revealed that Rivera-Rodrigues was in the area of the murder during the time it was committed, the testimony would have required disclosure—as it would have amounted to expert opinion testimony. However, Neeman did not testify to that effect. Neeman testified explaining the sectors and which sectors were used by the phone number associated with Rivera-Rodrigues. He did not testify stating his opinion of Rivera-Rodrigues's location throughout the day of the murder.

*Id at 4.*

We are now called upon to review this trial court's ruling permitting Detective Snider to testify as a lay witness and apply historical cell tower data with no underlying expert opinion explaining the technology. Detective Snider used the AT&T report to locate and mark tower latitude and longitude points on a Google™ map. The Commonwealth asserts anyone could read the records, open a Google™ Maps program on a computer, enter the addresses, locations, or coordinates including latitude and longitude, and obtain the same results. In summary, that meant Detective Snider's testimony qualified as lay testimony. We agree.

In this case, the Commonwealth did not present the map to make a claim as to Torrence's location at the time of the shooting. Detective Snider was careful to avoid any opinion on that subject while he testified from the records and marked the map. In closing argument, the Commonwealth pointed out the map with its marked locations did not support Torrence's claimed alibi. The map was not central to the Commonwealth's case, which focused on Thomas's

20

account of the shooting and the subsequent police investigation that supported his account. Rather, central to the Commonwealth's case was the police tracking down a Gray Ford Explorer described by Thomas as involved in the shooting, connecting that Ford Explorer to Torrence, securing nearby home surveillance video, locating witnesses, utilizing lab and evidence technicians, and obtaining a statement from Torrence that was not helpful to his defense and was, in many respects, incriminating. Problems with Torrence's alibi inferred from the marked tower locations on the map were a small part of the Commonwealth's overall case.

Use of phone company records in police investigations is ever more commonplace because cell phones offer law enforcement significant information. Cell tower reports do not show exactly where someone's cell phone was at specified times, but often do show where the cell phone was not. In this case, Detective Snider explained to the jury how he obtained the cell phone records, what the records detailed for each call, and applied the information from the records to a map program. Only in closing argument did the Commonwealth assert a reasonable inference could be drawn from the points marked on the map.

Could a juror apply the longitude and latitude coordinates from the report to a Google™ map? While there is no absolute answer to that question, we note elementary-school-aged children in Kentucky are offered or taught basic plotting on graphs. The Kentucky Academic Standards for the Kentucky Department of Education for Mathematics adopted in 2019 for fifth grade sets

21

out the following in the Grade 5 Overview for Geometry: "Graph points on the coordinate plane to solve real-world problems" (p. 97). The overview on page 111 states "After gathering data on a question, students discuss which graphs are possible and which ones are not possible, and why. Students select one type of graph that fits the data gathered and create the graph, by hand, or by using technology." This language coincides with what Detective Snider did in this case. Simple graphing of data points is something we can reasonably expect jurors to know or at least understand without relying on an expert's explanation.

We find support for Google™ mapping of cell towers by a lay witness in federal authority. In *United States v. Evans*, 892 F. Supp. 2d 949 (N.D. Ill. 2012), a case remarkably comparable to the current case, a reviewing court was called upon to determine if a special agent could testify as a lay witness concerning cell tower data and references that could be drawn from it. The court held that the agent could testify as a lay witness as to some matters, but other issues, including the granulization theory of cell phone location based on cell tower data, required expert testimony. *Id.* at 954. As to simple mapping of cell tower locations, the Illinois federal court said:

> As an initial matter, the government argues that a portion of Special Agent Raschke's testimony is admissible under Rule 701, specifically, his testimony concerning maps he created indicating the location of certain cell towers used by Evans's phone during the course of the conspiracy in relation to other locations relevant to the crime. . . . The court agrees that using Google Maps to plot these locations does not require scientific, technical, or other specialized knowledge and that these exhibits are admissible through lay opinion testimony under Rule 701.

22

*Id.* at 953.

Turning to other neighboring states, we find that many of their state appellate courts allow non-experts to plot points on a map from cell tower reports. Tennessee, in an unpublished opinion often cited in subsequent cases, permitted the plotting of cell tower locations on a map by a detective concluding no specialized knowledge was required. *State v. Hayes*, M200802689CCAR3CD, 2010 WL 5344882, (Tenn. Crim. App. Dec. 23, 2010). Tennessee in a separate unpublished case permitted a detective to testify about cell tower data, not as an expert, but as someone who read the "how to" booklet that came with the cell report. *State v. Greer*, E201500922CCAR3CD, 2017 WL 2233647 (Tenn. Crim. App. May 17, 2017).

In 2018, Ohio reaffirmed earlier cases comparing crime scene locations to cell phone data records as not requiring specialized knowledge, skill, experience, training or education regarding cellular networks. *State v. Johnson*, 110 N.E.3d 800, 807 (Ohio Ct. App.), *appeal not allowed*, 104 N.E.3d 792 (Ohio 2018). Ohio also allows cell tower mapping by lay witnesses to do more. Typically, cell tower mapping by a lay person permits an inference to be drawn that the cell phone owner was in the area at the listed time, to corroborate other evidence of the defendant's presence at a crime scene. *State v. Bradford*, 101 N.E.3d 710, 725 (Ohio Ct. App. 2018). See also *State v. Daniel*, 57 N.E.3d 1203, 1218 (Ohio Ct. App. 2016) and *State v. Boaston*, 100 N.E.3d 1002, 1014 (Ohio Ct. App. 2017), *appeal allowed*, 100 N.E.3d 445 (Ohio 2018).

23

We also note two cases from Indiana. We are mindful that both cases have been reversed either in a subsequent appeal of the same case or by United States Supreme Court remand, however, we note for both cases the reversal or remand was on other grounds. The first is *Zanders v. State*, 73 N.E.3d 178, 188 (Ind. 2017), *cert. granted, judgment vacated*, 138 S. Ct. 2702 (2018). The reviewing court discussed the testimony of "skilled witnesses."

> A skilled witness, by contrast, is a person with "a degree of knowledge short of that sufficient to be declared an expert under [Indiana Evidence] Rule 702, but somewhat beyond that possessed by the ordinary jurors." A skilled witness, then, will "perceive more information from the same set of facts and circumstances than an unskilled witness would." The skilled witness may give an opinion "(a) rationally based on the witness's perception; and (b) helpful to a clear understanding of the witness's testimony or to a determination of a fact in issue."

*Id.*

The court in *Zanders* allowed the detective to testify in order to help the jury understand Sprint phone records. Any dispute about the accuracy of the records went to the weight not admissibility. *Id.* at 189.

The second Indiana case deals with maps, latitude and longitude coordinates and assisting the jury in understanding the records. The court stated:

> For instance, the exhibit containing the challenged phone records is extremely thorough and difficult to comprehend because it contains tables of primarily coded or numerical data that comprises numerous pages as to each call or message. State's Ex. 148. In fact, the maps—not the phone records—were the method for conveying the estimated locations to the jury because the phone records themselves contained only latitude and longitude coordinates that would likely have been meaningless to the jury without the maps.

24

*McCowan v. State*, 10 N.E.3d 522, 532 (Ind. Ct. App.), *transfer granted, opinion vacated*, 14 N.E.3d 44 (Ind. 2014), and *opinion aff'd in part, vacated in part*, 27 N.E.3d 760 (Ind. 2015).

The court in *McCowan* noted the detective did not testify as an expert but testified from four limited specialized trainings attended over a four-year period concerning general principles involving cell phone technology. The detective performed no calculations and provided limited background information. Id. at 532-33.

In summary three neighboring states, Ohio, Tennessee and Indiana permit lay testimony for marking maps with data from cell phone records. The defense can cross examine the witness as to the reports and underlying data as well as contest the maps. The defense can call expert witnesses that arrive at different conclusions based on the same data and that is what occurred in *McCowan.*

All three state courts were clear that analyzing data from the records and explaining what it means beyond simply marking coordinates on a map, requires an expert. We agree with our sister states' conclusions: marking points on a graph—in these cases a map—based on a cell phone report including latitude and longitude of cell towers, does not require an expert.

We emphasize that this new rule with respect to the use of lay testimony to present historical cell-tower data is limited in its application. Our holding today is that lay testimony may be used to present historical cell-tower data so long as the testimony does not go beyond simply marking coordinates on a

25

map. If the witness seeks to offer an opinion about inferences that may be drawn from that information, that witness must be presented as an expert witness under KRE 702 (for example, if a witness seeks to provide an opinion as to the location of the cell phone during the relevant time based on the plotted coordinates).

The investigative usage of the historical cell tower report in this case is distinguishable from our holding in *McNeil v. Commonwealth*, 468 S.W.3d 858 (Ky. 2015). In *McNeil*, a detective used cell-phone records to identify the owner of a cell-phone number. *Id.* at 871. In contrast to the detective's conduct in *McNeil*, Detective Snider's use of the historical cell-phone data in this case required a much greater degree of "knowledge, skill, experience, training, or education," KRE 702, than simply reading whose name was listed as the owner of a cell-phone number. Also, the detective in *McNeil* was permitted to show the jury during his testimony a copy of the phone record to provide a "demonstrative aid" to the detective's testimony explaining how McNeil became a suspect in the case. *McNeil*, 468 S.W.3d at 872. In contrast, here, Detective Snider used the cell-phone data to plot geographical points on a map, which was entered into evidence, to cast doubt on Torrence's claimed alibi. The only reason this Court allowed the detective's testimony and use of the records in *McNeil* was that the detective was not offering any opinion as to the inferences that may be drawn from the cell-phone records. In fact, the trial court did not initially allow the cell records to be introduced into evidence because they would not be presented by someone from the phone company; i.e. by someone

26

who could authenticate them. For the foregoing reasons, we hold the trial court did not abuse its discretion in overruling Torrence's motions and permitting the detective to testify as a lay witness and mark coordinates on a map based on cell tower historic data reports.

## C. Photo Array

Torrence's final assertion of error is the trial court failed to suppress and exclude from evidence a photo array identification and a subsequent in-court identification, both made by Thomas. The claim arises because Thomas's sister or girlfriend (the record is not entirely clear as to which one) showed him a single photograph of Torrence derived from a social media site just before police arrived and showed Thomas a photo array. Torrence claims the police photo array identification following Thomas seeing the single photo was a procedure so suggestive as to render any identifications unreliable. The trial court noted the motion was untimely and overruled it finding no state action was involved in the single photo being shown first.

The trial court's decision will be reviewed under an abuse of discretion standard. An abuse of discretion occurs when a "trial judge's decision is arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *English,* 993 S.W.2d at 944.

Some additional background information is necessary as we analyze this issue. Thomas told police after he was shot, but before he was taken to the hospital by ambulance, that an individual he knew as "Man-Man" shot him. After being taken to the hospital and rushed to surgery, Thomas was placed in

a medically induced coma, in which he remained for several days. After coming out of the coma, Thomas told the police that prior to the day of the shooting, he had previously met the shooter, knew generally where he lived, and knew him by his nickname, Man-Man. In a subsequent interview with detectives on May 26, nine days after the shooting, Thomas picked Torrence from a photo lineup.

The same day Thomas was shown the photo array and identified Torrence, his sister and girlfriend visited him at the hospital. Prior to the Detectives' arrival, the visitors showed Thomas a single photo of Torrence downloaded from a social media post. Shortly thereafter, Thomas reviewed a police-generated six-photo array and picked Torrence as the shooter. After the photo array identification, Detective Snider collected the single photograph from Thomas's family and included it in the police file. Although police had asked the family for help in identifying the shooter, there is no evidence in the record Thomas was shown the single photograph at police request.

We begin with a review of the photo array. It is a standard police array containing six facial photographs including head and neck, all made in front of a grey background. Six African-American men are shown wearing black T-shirts and are approximately the same age. Three of the men have facial hair ranging from a goatee to a slight beard, and all six have mustaches. Skin color in the photos ranges from three with darker tones to three with lighter tones. No photograph has any special or unique features or attributes that draw attention to it. Torrence raises no issue with the photo array photos, but objects to the identification made from the array by Thomas *after* he was

28

shown a single photo of Torrence by his sister or girlfriend as they visited him in the hospital. A black and white copy of the single photo collected by Detective Snider from Thomas's family was admitted into evidence and shows Torrence sitting in a vehicle wearing a hat and track suit, his face clearly visible.

Torrence claims state action is present in this case because the Commonwealth claimed, in opening and closing arguments, that police recruited Thomas's family to help them determine the shooter's identity. According to Torrence, this "recruitment" resulted in state action when the family showed Thomas the single photograph before detectives showed him the photo array.

State action is required for the trial court to exclude an identification procedure. A due process check on the admission of eyewitness identification is applicable when the police have arranged suggestive circumstances leading to an identification by an eyewitness. *Perry v. New Hampshire,* 565 U.S. 228, 237 (2012). The United States Supreme Court has not extended pretrial screening for reliability of identification to situations not arranged by law enforcement. *Id.* at 233. Instead, the U.S. Supreme Court has relied on other rights and opportunities to challenge the suspect identification including the right to counsel, vigorous cross-examination, and jury instructions requiring proof beyond a reasonable doubt. *Id.* at 237.

This Court has likewise found those and other protections sufficient to protect the rights of defendants when it comes to suspect identifications. We said:

> We trust that these same safeguards will continue to protect the rights of defendants first identified in court, leaving the jury with responsibility for assessing the credibility of the identification in each case. As often noted, throughout Anglo-American history, "[d]ecisions as to human life, liberty and public and private property have been routinely made by jurors and extraordinary confidence has been placed in this decision-making process." *Curry v. Fireman's Fund Ins. Co.,* 784 S.W.2d 176, 178 (Ky. 1989).

*Fairley v. Commonwealth,* 527 S.W.3d 792, 799–800 (Ky. 2017).

As we further made clear when it came to suspect identifications, "Absent the 'taint of improper state action,' *Perry* establishes that the jury and the ordinary rules of trial provided Jeter with all the process due him for contesting Albrecht's testimony. Thus, on the asserted due process grounds Jeter is not entitled to relief." *Jeter v. Commonwealth,* 531 S.W.3d 488, 495 (Ky. 2017).

In this case, there is no evidence in the record that Thomas's family or girlfriend was acting at police behest when they located and showed Thomas the single photograph of Torrence downloaded from social media. Thomas viewing the single photo and the police photo array on the same day, after coming out of a medically induced coma, based on the record appears to have been a coincidence. Thomas, at that point, was finally physically able to speak to someone about the shooting, and meeting with his family and police on the same day is not particularly suspect. That the two showings happened on the

same day was a result of Thomas's critical injuries, extensive medical treatment, and being one of the first opportunities for him to view photos.

Absent improper state action, the weight to give a suspect identification is best left to juries to sort out. "A primary aim of excluding identification evidence obtained under unnecessarily suggestive circumstances . . . is to deter law enforcement use of improper lineups, showups, and photo arrays in the first place." *Perry*, 565 U.S. at 241 (citing *Manson v. Brathwaite*, 432 U.S. 98, 112 (1977)). That exclusionary goal is absent where, as here, there has been no state action.

A review of the record shows that other constitutional protections afforded Torrence were active in this case. One clear example from the record is worth noting. When Thomas denied multiple times during the Commonwealth's questioning that he saw the single photo before he saw the photo array, and even went so far as to claim he had not seen the single photo at any time before he testified, Torrence's counsel seized the opportunity. Under capable cross-examination by defense counsel, Thomas changed his mind and his testimony. With some skilled questioning, Thomas conceded seeing the photo first.

Thomas acknowledged seeing the single photo when confronted with an audio recording of his statement to the police. After hearing his own words on audio tape played for the jury, Thomas acknowledging seeing the single photo first. The Commonwealth's key witness was caught over-stating a claim and forced to backtrack on testimony given minutes earlier that he never saw the

31

single photo prior to trial. In the best possible light, he was mistaken, or perhaps, when viewed in a different light, Torrence's counsel caught him in an outright lie.

Was Thomas's significant medical treatment the cause of his misstatement, did his memory slip over time, or were the repeated denials an effort to make his identification of Torrence appear untainted? These possible questions went unanswered and regardless, the jury saw classic impeachment of a witness with his own words. Thomas's about-face concession as to when he saw the single photograph was a result of effective cross-examination by defense counsel confronting him with a prior recorded statement.

The presence of counsel, vigorous cross-examination, and a jury instruction requiring proof beyond a reasonable doubt were among the protections noted in *Perry* and present in this case. Coupled with these protections is the absence in the record of any proof of state action in the prior showing of the single photo.

Without state action, the two-prong test often cited requiring the trial court to inquire as to whether the identification was unduly suggestive, and if so, then determine was it admissible under a totality of circumstances test, is inapplicable. *See Barnes v. Commonwealth*, 419 S.W.3d 584 (2013); *Duncan v. Commonwealth*, 322 S.W.3d 81 (2010); *Oakes v. Commonwealth*, 320 S.W.3d 50 (2010); *King v. Commonwealth*, 142 S.W.3d 645 (2004); *Wilson v. Commonwealth*, 695 S.W.2d 854 (Ky. 1985).

The trial court's decisions to permit the identifications, outside court as well as during trial, were not an abuse of discretion. With no state action involved in showing Torrence the single photograph, the decision to overrule the motion without a hearing was consistent with caselaw and supported by long standing legal principles.

## III. CONCLUSION

After careful review of the issues presented, we affirm Appellant's convictions and their corresponding sentences.

All sitting. All concur.

COUNSEL FOR APPELLANT:

Franklin Todd Lewis
Lewis Law, PLLC

COUNSEL FOR APPELLEE:

Daniel Jay Cameron
Attorney General of Kentucky

Emily Lucas
Assistant Attorney General